JDG:AMC
F. #2013R01359

# 14 MISC 021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – –X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO A SPECIFIED WIRELESS
TELEPHONE

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION
(Fed. R. Crim. P. 41; T. 18, U.S.C.,
§§ 2703(c)(1)(A), 3103a and 3117;
T. 28, U.S.C., § 1651(a))

– – – – – – – – – – – – – – – –X

EASTERN DISTRICT OF NEW YORK, SS:

      I, Peter Kilpatrick, being first duly sworn, hereby depose and state as follows:

      1.      I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information

about the location of the cellular telephone assigned call number (832) 421-2819, with IMEI

number 013054000018368, subscribed to by Diana Durand of 8815 Wheatland Drive,

Houston, Texas 77040 (the "SUBJECT TELEPHONE"), whose wireless telephone service

provider is AT&T Mobility (the "Service Provider").   The SUBJECT TELEPHONE is

described herein and in Attachment A, and the location information to be seized is described

herein and Attachment B.

      2.      I have been a Special Agent with the Federal Bureau of Investigation

("FBI") for approximately five years.   I am currently assigned to a squad tasked with

conducting investigations into the activities of individuals and criminal groups responsible for

public corruption.   I have participated in several long-term public corruption investigations,

during the course of which I executed search warrants and arrest warrants, reviewed and analyzed taped conversations, debriefed witnesses, including cooperating witnesses and confidential sources, and have participated in undercover investigations.   As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

      3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.   Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.   In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

      4.     Based on the facts set forth in this affidavit, there is probable cause to believe that in the Eastern District of New York and elsewhere, DIANA DURAND committed election law crimes in violation of Title 2, United States Code, Sections 441a(a)(1)(A) and 441f and made false statements in violation of Title 18, United States Code, Section 1001(a)(2) (the "Subject Offenses").   There is also probable cause to believe that DIANA DURAND has used and continues to use the SUBJECT TELEPHONE.   There is therefore probable cause to believe that the location information, including but not limited to E-911 Phase II data (or other precise location information) concerning the SUBJECT TELEPHONE (the "REQUESTED INFORMATION"),[1] as described in Attachment B, will assist law enforcement in effecting an

---

[1]     Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONE at the

arrest warrant for DURAND issued in connection with her commission of the Subject

Offenses.

## FACTS SETTING FORTH PROBABLE CAUSE

5.    On August 20, 2013, United States Magistrate Judge Vera M. Scanlon

signed a sealed warrant authorizing the arrest of DIANA DURAND.   See United States v.

Diana Durand, M-13-724 (E.D.N.Y.)   The sealed complaint and affidavit in support of the

request for that arrest warrant and the warrant, which are attached as Attachment C and

incorporated herein by reference, articulated certain facts that provided probable cause to

believe that DURAND committed election law crimes and made false statements in violation

of Title 2, United States Code, Sections 441a(a)(1)(A) and 441f and Title 18, United States

Code, Section 1001(a)(2), respectively.   Specifically, the affidavit stated that DURAND:

(a) exceeded contribution limits for the election of a candidate to federal office, which

contributions exceeded the limitation contained in the Federal Election Campaign Act of 1971,

and which violation aggregated more than $2,000 during the 2010 calendar years; (b) made,

and caused to be made contributions of money, aggregating more than $10,000 during the

2010 calendar year, in the names of others to two federal campaign committees formed to

received campaign contributions for the election of two candidates to federal office (referred to

as "Candidate A" and "Candidate B" in Attachment C); and (c) made one or more materially

---

start and end of any call or text message transmission.   In requesting cell site information, the
government does not concede that such cell site records — routinely retained by wireless
carriers as business records — may only be obtained via a warrant issued on probable cause.
See In re Application, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective
acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.);
In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States.

6.      There is probable cause to believe that DURAND has used and continues to use, the SUBJECT TELEPHONE.   According to telephone subscriber records from October 2013, the SUBJECT TELEPHONE is subscribed to an individual named Diana Durand of 8815 Wheatland Drive, Houston, Texas 77040.   Additionally, I believe that the SUBJECT TELEPHONE continues to belong to DURAND because of my analysis of telephone records, including records pertaining to the SUBJECT TELEPHONE.[2]   DURAND, in interviews with FBI agents, has previously acknowledged maintaining telephone contact with the individual referred to as Candidate A in Attachment C.   Telephone call detail records reveal that between December 6, 2013 and January 5, 2014, there were 132 contacts between the SUBJECT TELEPHONE and a cellular telephone subscribed to Candidate A.   Such contacts included telephone calls (including unanswered calls) and text messages between Candidate A and DURAND.

7.      Moreover, there is therefore probable cause to believe that the REQUESTED INFORMATION will provide information concerning DURAND's location that is necessary to assist law enforcement officers in effecting the arrest warrant.

---

[2]      On August 3, 2012, the Honorable Roanne L. Mann, United States Magistrate Judge, issued an order authorizing the use of a pen register and a trap and trace device on the SUBJECT TELEPHONE for a period of 60 days.  On October 3, 2012, the Honorable Ramon E. Reyes, United States Magistrate Judge, issued an order reauthorizing the use of a pen register and a trap and trace device on the SUBJECT TELEPHONE for a period of 60 days. On November 29, 2012, the Honorable Joan M. Azrack, United States Magistrate Judge, issued an order reauthorizing the use of a pen register and a trap and trace device on the SUBJECT TELEPHONE for a period of 60 days.  (See Misc. 12-517).

## AUTHORIZATION REQUEST

8.      WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and

18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing

agents to obtain the REQUESTED INFORMATION for a period of 30 days.   This Court has

jurisdiction to issue the requested warrant and Order because it is "a court of competent

jurisdiction" as defined by 18 U.S.C. § 2711.   See 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A).   Specifically, the Court is "a district court of the United States (including a

magistrate judge of such a court) . . . that — has jurisdiction over the offense being

investigated."   18 U.S.C. § 2711(3)(A)(i).

9.      IT IS FURTHER REQUESTED that the Court direct the Service

Provider to assist law enforcement by providing all information, facilities and technical

assistance needed to ascertain the REQUESTED INFORMATION, and further direct the

service provider to initiate a signal to determine the location of the SUBJECT TELEPHONE

on the service provider's network or with such other reference points as may be reasonably

available and at such intervals and times as directed by the law enforcement officer serving the

proposed order, and to furnish the technical assistance necessary to accomplish the acquisition

unobtrusively and with a minimum of interference with such services as that provider accords

the user(s) of the SUBJECT TELEPHONE, for a period of 30 days.   Reasonable expenses

incurred pursuant to this activity will be processed for payment by the FBI.

10.      IT IS FURTHER REQUESTED that the Court authorize execution of

the warrant at any time of day or night, owing to the potential need to locate the SUBJECT

TELEPHONE outside of daytime hours.

11.     IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and

Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the

warrant to delay notice until 30 days after the collection authorized by the warrant has been

completed or any extension thereof.   This delay is justified because there is reasonable cause

to believe that providing immediate notification of the warrant may have an adverse result, as

defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscribers or users of the

SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such

disclosure would give the targets of the investigation an opportunity to destroy evidence, harm

or threaten victims or other witnesses, change patterns of behavior, notify confederates, and

flee from and evade prosecution.   Moreover, to the extent that the warrant authorizes the

seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any

stored wire or electronic information, there is reasonable necessity for the seizure for the

reasons set forth above.

12.     IT IS FURTHER REQUESTED that this Court issue an order sealing,

until further order of the Court, all papers submitted in support of this application including the

application and search warrant.   I believe that sealing these documents is necessary because

the items and information to be seized are relevant to an ongoing investigation into the crimes

described above, and not all of the targets of this investigation will be searched at this time.

Based upon my training and experience, I have learned that criminals actively search for

criminal affidavits and search warrants via the internet, and disseminate them to other

criminals as they deem appropriate, e.g., by posting them publicly through online forums.   In

addition, I believe there is a probability that this application, if unsealed, would also be the

subject of media coverage that would further provide other targets with notice of the

particulars of this application.   Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

13.    IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding AT&T Mobility not to notify any person (including the subscribers or customers of the account listed in the attached warrant) of the existence of the attached warrant until further order of the Court.

Dated: Brooklyn, New York
      January 8, 2014

Peter Kilpatrick
Special Agent
Federal Bureau of Investigation

Sworn to before me this
8th day of January, 2014

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

Property To Be Searched

1.      The cellular telephone assigned call number (832) 421-2819 (the "SUBJECT TELEPHONE"), with IMEI number 013054000018368, subscribed to by Diana Durand of 8815 Wheatland Drive, Houston, Texas 77040, whose wireless service provider is AT&T Mobility, a company headquartered at 1025 Lenox Park Blvd NE, Atlanta, GA 30319 5309.

2.      Information about the location of the SUBJECT TELEPHONE that is within the possession, custody, or control of AT&T Mobility.

**ATTACHMENT B**

Particular Things to be Seized

All information about the location of the SUBJECT TELEPHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the SUBJECT TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T Mobility is required to disclose the Location Information to the government. In addition, AT&T Mobility must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T Mobility's services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on AT&T Mobility's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T Mobility for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. See 18 U.S.C. § 3103a(b)(2).

**ATTACHMENT C**

PT:TDK:AMC
F#2013R01359

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

13 M 724

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DIANA DURAND,

          Defendant.

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT

(T. 2, U.S.C.,
§§ 441a(a)(1)(A) and
441f; T. 18, U.S.C.,
§ 1001(a)(2))

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      GEOFFREY FORD, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between
March 2010 and October 2010, within the Eastern District of New
York and elsewhere, the defendant DIANA DURAND did knowingly and
willfully make, and cause to be made, contributions to
Committee A, a federal campaign committee formed to receive
campaign contributions for the election of Candidate A to federal
office, which contributions exceeded the limitation contained in
the Federal Election Campaign Act of 1971, and which violation
aggregated more than $2,000 during the 2010 calendar year.

      (Title 2, United States Code, Sections 441a(a)(1) and
437g(d)(1)(A)(ii))

Upon information and belief, in or about and between March 2010 and October 2010, within the Eastern District of New York and elsewhere, the defendant DIANA DURAND did knowingly and willfully make, and cause to be made, contributions of money, aggregating more than $10,000 during the 2010 calendar year, in the names of others, to Committee A, a federal campaign committee formed to receive campaign contributions for the election of Candidate A to federal office, and to Committee B, a federal campaign committee formed to receive campaign contributions for the election of Candidate B to federal office.

(Title 2, United States Code, Sections 441f and 437(g)(d)(1)(D)(i))

Upon information and belief, on or about June 14, 2012, within the Eastern District of New York and elsewhere, the defendant DIANA DURAND did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States.

(Title 18, United States Code, Section 1001(a)(2))

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

1.  I am a Special Agent with the FBI and have served in that capacity for approximately six years.  During that time, I have been assigned to a squad tasked with conducting investigations into the activities of individuals and criminal groups responsible for public corruption.  I have participated in several long-term public corruption investigations, during the course of which I have executed search warrants and arrest warrants, reviewed and analyzed taped conversations, debriefed witnesses, including cooperating witnesses and confidential sources, and participated in undercover investigations.  The information set forth in this affidavit is based upon my participation in witness interviews, a review of documentary evidence and records and discussions with other law enforcement agents.  The FBI is part of the United States Department of Justice and constitutes an agency within the executive branch of the Government of the United States.

## INTRODUCTION

### A.  Federal Campaign Finance Law

2.  The Federal Election Campaign Act of 1971, as amended, codified as Title 2, United States Code, Sections 431 through 455 (the "Election Act"), regulated financial activity intended to influence the election of candidates for federal office.  In order to limit the influence that any one person could have on the outcome of a federal election, the Election Act

established limits on the amounts individuals could contribute to an individual candidate's political campaign committee. Specifically, Section 441a of the Election Act set limits on the amount of money any person may contribute to a particular campaign committee.

3.    To promote transparency and prevent individuals from circumventing these regulations, the Election Act prohibited a person from making a political contribution in the name of another person, including giving funds to a "straw donor," or conduit, for the purpose of having the straw donor pass the funds on to a federal candidate as her or his own contribution. Specifically, Section 441f of the Election Act prohibited a contributor from contributing to a congressional campaign in the name of another person.

4.    The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act.  In order to deter abuses and instill public confidence in the election process, the FEC was and is responsible for making available to the public specific information about the amounts and sources of political contributions to federal candidates and their political committees.

5.    Pursuant to the Election Act, the FEC required campaign committees, such as Committee A and Committee B, to file

periodic reports of receipts and disbursements, identifying, among other things, each person who made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within the calendar year, together with the date and the amount of any such contribution.   In preparing these reports, federal candidates and political committees relied on the information provided by the donor, including the donor's name, address, and occupation.   These periodic reports, which were filed with the FEC and made publicly available, were intended to provide citizens with a transparent record of all contributions to candidates for federal office.

6.   In 2010, the Election Act limited both primary and general election campaign contributions to $2,400, resulting in an overall limit of $4,800 in contributions that any person could contribute to any one candidate during the 2010 election cycle.

**B.   Committee A**

7.   In 2010, Committee A was a federal campaign committee formed to receive campaign contributions for the election of Candidate A, a individual running for a congressional seat representing a district located in the Eastern District of New York.

8.   Committee A's bank account, into which contributions to Committee A were deposited, was maintained at a

bank located in the Eastern District of New York.  Committee A's address was also located in the Eastern District of New York.

## C.   **DIANA DURAND**

9.    The defendant DIANA DURAND was a personal friend of Candidate A.  In 2009 and 2010, DURAND engaged in fundraising efforts in support of Candidate A's campaign for election to Congress in 2010, including hosting and organizing a November 2009 "meet and greet" event where DURAND invited individuals to meet Candidate A and contribute to Committee A.

10.    In November 2009, DURAND donated $4,800 to Committee A, the maximum allowable amount that any individual was permitted to donate to Committee A for the 2010 election cycle.

11.    At the time of her November 2009 donation of $4,800, DURAND was aware that she was not permitted to make further monetary contributions to Committee A.  In a November 2009 email soliciting contributions to Committee A, DURAND stated to two acquaintances that "the max you can donate is 4800.00 and after that you can't give a dime, so believe me if I could give more than that so I wouldn't have to ask everyone for help thats [sic] what I would do . . . ."

## OFFENSE CONDUCT

12.  In or about the spring of 2012, fellow FBI agents and I were investigating whether violations of the Election Act had occurred in connection with Committee A.  Specifically, the investigation concerned whether individuals had circumvented contribution limits by funneling contributions through straw donors who were reimbursed for their donations, in violation of Sections 441a(a) and 441f of the Election Act.

13.  As part of this investigation, the FBI conducted a number of interviews.  On or about June 12, 2012, I, along with a fellow FBI Special Agent, conducted an interview of Donor A, an individual who had contributed $4,800 to Committee A in November 2009.  During this interview, Donor A stated that s/he made this contribution at DURAND's request after DURAND promised to reimburse her/him for the full $4,800 amount by agreeing to rent a vacation property owned by Donor A, the cost of which would have roughly equaled the amount of the donation.  Donor A further stated that DURAND never rented her/his vacation property following her/his donation and that DURAND never reimbursed Donor A in any other manner.

14.  Following the interview with Donor A, Donor A and Donor A's spouse spoke to DURAND over the telephone and told her that they had been visited by the FBI and that the FBI

questioned them concerning the donation Donor A made to Committee
A at DURAND's request.

15.   On or about June 14, 2012, I, along with a fellow
FBI Special Agent, conducted an interview of Straw Donor #1, an
individual who had contributed $4,800 to Committee A in March
2010 using her/his credit card.[2/]  During this interview, Straw
Donor #1 stated that s/he made this contribution at DURAND's
request after DURAND promised to reimburse her/him for the full
amount.  Straw Donor #1 also stated that s/he would not have made
the contribution had DURAND not promised to reimburse her/him.
Straw Donor #1 further stated that DURAND had in fact reimbursed
her/him by issuing Straw Donor #1 a check for $4,800 shortly
after Straw Donor #1 had made a contribution to Committee A in
that amount.

16.   During the interview, Straw Donor #1 provided me
with a paper copy of an email that DURAND sent on April 5, 2010
to both Straw Donor #1 and another individual, Straw Donor #2,
shortly after Straw Donor #1 made the $4,800 contribution to
Committee A.  The email from DURAND stated in full:

> I just wanted to thank you both again for
> helping me out with [Candidate A's] campaign
> last week.  I can't tell you how priceless it
> is to have friends that I can count on to do
> something like that, simply PRICELESS.

---

[2/] During the interview, Straw Donor #1 was unsure whether the
donation was made in her/his name or her/his spouse's name.

I was hoping for my birthday you will just
let me forget about paying you
back...........☺ Just kidding!  I still have
to make the deposit but I can write you both
a check or I can get your account numbers and
do a transfer, whatever works for you.

Thank you, thank you, thank you, thank you

17.  A review of publicly available campaign donation
records and subpoenaed bank records reflect both the $4,800
contribution to Committee A associated with Straw Donor #1 as
well as DURAND's reimbursement of the donated amount to Straw
Donor #1.  Specifically, publicly available campaign contribution
records show that on or about March 31, 2010, the spouse of Straw
Donor #1 contributed $4,800 to Committee A.  A review of bank
records revealed that on or about April 6, 2010, Straw Donor #1
deposited a check for $4,800 into a bank account held jointly by
Straw Donor #1 and her/his spouse.  The deposited check was
issued by DURAND from her checking account.  I have reviewed the
signature card from DURAND's checking account as well as the
signature on the $4,800 check issued by DURAND to Straw Donor #1,
and, based upon this review, it appears that DURAND signed the
check.

18.  On or about June 14, 2012, I, along with a fellow
FBI Special Agent, conducted an interview of Straw Donor #2.
During this interview, Straw Donor #2 stated that s/he made a
$4,800 contribution to Committee A in March 2010 at DURAND's
request after DURAND promised to reimburse her/him for the full

$4,800 amount. Straw Donor #2 also stated that s/he would not have made this contribution if DURAND had not promised to reimburse her/him. Straw Donor #2 further stated that DURAND had in fact reimbursed her/him by issuing Straw Donor #2 a check for $4,800 shortly after Straw Donor #2 had made a contribution in that amount.

19.     A review of publicly available campaign contribution records and subpoenaed bank records reflect both Straw Donor #2's contribution of $4,800 to Committee A as well as DURAND's reimbursement of the contributed amount to Straw Donor #2. Specifically, publicly available campaign contribution records show that on or about March 31, 2010, Straw Donor #2 and her/his spouse contributed $4,800 to Committee A. A review of bank records revealed that on or about April 8, 2010, Straw Donor #2 deposited a check for $4,800 into a bank account jointly held by Straw Donor #2 and her/his spouse. The deposited check was issued by DURAND from her checking account, and the signature on the check appears to be DURAND's.

20.     During a follow-up interview with Straw Donor #2 held in the Eastern District of New York in July 2013, Straw Donor #2 told a fellow FBI Special Agent that in addition to the contribution referenced above, s/he also contributed to Committee B, the congressional campaign committee for another candidate for election to a congressional seat in another district, at DURAND's

urging in 2010. In this instance, however, DURAND provided Straw Donor #2 with funds beforehand, as opposed to reimbursing her/him after the donation to Committee B was made. Specifically, Straw Donor #2 stated that s/he and her/his spouse made a $4,800 contribution to Committee B after DURAND provided her/him with a check for that amount.

21. Bank records I have reviewed reveal that on or about October 20, 2010, a check from DURAND's checking account for $4,800 payable to Straw Donor #2 was deposited into a bank account held in the name of Straw Donor #2 and her/his spouse. I have reviewed this check, and the signature on the check appears to be DURAND's. Bank records also reveal that on or about October 21, 2010, the following day, Straw Donor #2 issued a check for $4,800 payable to Committee B that was drawn on an account held by Straw Donor #2 and her/his spouse.

22. A review of publicly available campaign contribution records and subpoenaed bank records also reflect that DURAND contributed to Committee A through a third individual, Straw Donor #3, a relative of DURAND. Specifically, on or about November 19, 2009, DURAND transferred $1,000 from her Bank of America checking account to a Bank of America checking account held in the name of Straw Donor #3. On the very same day, Straw Donor #3 donated $1,000 to Committee A through the debit card connected to her/his Bank of America checking account.

Case 1:14-mc-00021-LB Document 1 Filed 01/08/14 Page 22 of 29 PageID #: 22

Based upon the circumstances of these transactions, including the fact that DURAND paid Straw Donor #3 the very amount that Straw Donor #3 contributed to Committee A, and that DURAND's payment to Straw Donor #3 occurred on the same day as Straw Donor #3's contribution to Committee A, and based upon my training and experience, I believe that DURAND improperly contributed $1,000 to Committee A in the name of Straw Donor #3.

23. On or about June 14, 2012, I, along with a fellow FBI Special Agent conducted an interview of DURAND. Before starting the interview, we displayed our badges to identify ourselves and during the interview we warned DURAND that making false statements to federal agents constituted a crime.[3] During the interview, DURAND stated that she was aware of the campaign contribution limits applicable to contributions to Committee A for the 2010 election cycle. DURAND further stated that she was "100 percent certain" that she did not reimburse Straw Donor #2 after Straw Donor #2 contributed to Committee A, and that she "would never pay [Straw Donor #2] back" for making a contribution. With respect to Straw Donor #1, DURAND stated that she did not intend to reimburse Straw Donor #1 at the time she

---

[3] Several days prior to the interview, I spoke with DURAND by telephone, identified myself as an FBI agent and told her that a fellow agent and I wished to interview her concerning contributions to Committee A and that we wanted to schedule a time to meet. At that time, DURAND and I agreed to meet at DURAND's place of business on the afternoon of June 14, 2012.

requested the contribution from her/him, but that several days after Straw Donor #1 made her/his contribution, Straw Donor #1 called DURAND and requested a return of the money s/he had contributed because of the strain the donation placed on her/his family's finances.  As a result, DURAND stated, DURAND returned the $4,800 to Straw Donor #1.

24.  During a follow-up interview with Straw Donor #1 held in the Eastern District of New York in July 2013, Straw Donor #1 stated to a fellow FBI Special Agent that at no time did s/he request a return of her/his contribution from DURAND because of family financial issues or for any other reason.  Rather, Straw Donor #1 stated that DURAND had promised to reimburse Straw Donor #1 at the time DURAND requested that s/he make the contribution, and that after DURAND sent the April 5, 2010 email recounted above, DURAND reimbursed Straw Donor #1 without Straw Donor #1 having to ask DURAND to do so.

### Sealing

25.  Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's ongoing investigation, your affiant respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

14

WHEREFORE, your deponent respectfully requests that the defendant DIANA DURAND be dealt with according to law.

GEOFFREY FORD
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of August, 2013

THE HON. VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **NEW YORK**

UNITED STATES OF AMERICA

v.

**WARRANT FOR ARREST**

DIANA DURAND

CASE NUMBER: **13 M 724**

DEFENDANT.

TO: **SPECIAL AGENT GEOFFREY FORD**, and any Authorized United States Official

YOU ARE HEREBY COMMANDED to arrest **DIANA DURAND**

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

[ ] Indictment [ ] Information [✓] Complaint [ ] Order of Court [ ] Violation Notice [ ] Probation Violation Petition

charging him or her with (brief description of offense)

**Violations of the Federal Election Campaign Act; Lying to federal agents.**

In violation of Title 2 United States Code, Section(s) 441a;441f & 18 U.S.C. 1001

The Hon. VERA M. SCANLON

Name of Issuing Officer

*[signature]* USMJ

Signature of Issuing Officer

Bail fixed at $ _____

U.S. Magistrate Judge

Title of Issuing Officer

August 20, 2013

Date and Location

By _____

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ | | |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

# United States District Court

_____EASTERN_____  **DISTRICT OF** _____NEW YORK_____

In the Matter of the Search of
**(Name, address or brief description of person or property to be searched)**

IN RE APPLICATION OF THE UNITED STATES OF AMERICA
FOR AUTHORIZATION TO OBTAIN LOCATION DATA
CONCERNING A MOBILE TELEPHONE ASSIGNED NUMBER
(832) 421-2819

**SEARCH WARRANT**

**CASE NUMBER:**

TO: Special Agent Peter Kilpatrick _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____Special Agent Peter Kilpatrick_____ who has reason to
                                                                        Affiant

believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

THE PREMISES KNOWN AND DESCRIBED AS LOCATION DATA FOR A MOBILE TELEPHONE
ASSIGNED NUMBER (832) 421-2819, as set forth in Attachment A

in the _____EASTERN_____ District of _____NEW YORK_____ there is now concealed a certain
person or property, namely (describe the person or property)

See Attachment B.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the issuance
of this warrant.

                                                                    January 22, 2014
YOU ARE HEREBY COMMANDED to search on or before _____
                                                                              Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime - 6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has
been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt
for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this
warrant to the Magistrate Judge on duty _____ as required by law.
          United States Judge or Magistrate Judge

January 8, 2014   4:05 p.m.        at   Brooklyn, New York
_____            _____
Date and Time Issued                              City and State

USMJ LOIS BLOOM                          _____
_____            Signature of Judicial Officer
Name and Title of Judicial Officer

## ATTACHMENT A

### Property To Be Searched

1.     The cellular telephone assigned call number (832) 421-2819 (the "SUBJECT TELEPHONE"), with IMEI number 013054000018368, subscribed to by Diana Durand of 8815 Wheatland Drive, Houston, Texas 77040, whose wireless service provider is AT&T Mobility, a company headquartered at 1025 Lenox Park Blvd NE, Atlanta, GA 30319 5309.

2.     Information about the location of the SUBJECT TELEPHONE that is within the possession, custody, or control of AT&T Mobility.

F. #2013R01359

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

IN RE APPLICATION OF THE UNITED                    **TO BE FILED UNDER SEAL**
STATES OF AMERICA FOR
AUTHORIZATION TO OBTAIN LOCATION
DATA CONCERNING A MOBILE                           ORDER
TELEPHONE ASSIGNED NUMBER (832)
421-2819

- - - - - - - - - - - - - - X

      Application having been made for a search warrant under Federal Rule of

Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of

the cellular telephone assigned call number (832) 421-2819 , with IMEI number

013054000018368, subscribed to by Diana Durand of 8815 Wheatland Drive, Houston, Texas

77040(the "SUBJECT TELEPHONE") whose wireless telephone service provider is AT&T

Mobility (the "Service Provider"), as further described in Attachment B to the search warrant

(the "REQUESTED INFORMATION");

      The Court finds that there is reasonable cause to believe that providing

immediate notification of the execution of the warrant may seriously jeopardize an ongoing

investigation, including by giving targets an opportunity to flee or continue flight from

prosecution, destroy or tamper with evidence, change patterns of behavior, or notify

confederates.  See 18 U.S.C. §§ 2705(b)(2), 2705(b)(3) and 2705(b)(5).  Furthermore, the

execution of this warrant will not result in the seizure of any tangible property or any wire or

electronic communication (as defined in 18 U.S.C. § 2510).  To the extent that the warrant

authorizes the seizure of any stored wire or electronic information, that seizure is expressly

authorized by 18 U.S.C. § 2703(c)(1)(A).

personnel acting under the supervision of such law enforcement officers, and the service provider as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the issuing judicial officer within 14 days after the termination of the monitoring period authorized by the warrant.

It is further ORDERED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extension thereof.

It is further ORDERED under 18 U.S.C. § 2705(b) that AT&T Mobility shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the Court, except that AT&T Mobility may disclose the attached warrant to an attorney for AT&T Mobility for the purpose of receiving legal advice.

It is further ORDERED that this Order apply to any changed mobile telephone number subsequently assigned to the SUBJECT TELEPHONE within the period of this Order.

It is further ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

Dated: Brooklyn, New York
       January 8, 2014

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK